**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| SUSAN WHITAKER-PINE, Individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE FLAVIUS J. WITHAM MEMORIAL HOSPITAL,<br><br>Defendant. | Civil Action No.: 1:23-cv-1080-TWP-MJD<br><br>Judge Tanya Walton Pratt |

**BRIEF IN SUPPORT OF DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

## INTRODUCTION

The federal officer removal statute permits removal, in pertinent part, when the defendant is "any officer (or *any person acting under* that officer) of the United States or of any agency therefore . . . for or *relating to* any act under color of such office …" 28 U.S.C. § 1442(a)(1) (emphasis added). Through the Meaningful Use program and regulations, the federal government has incentivized and directed health care providers like Flavius J. Witham Memorial Hospital ("Witham") to offer patients online access to their records, and to optimize patient engagement with their medical information, including through the use of patient portals. As evidenced in the supporting declaration of Paul Frey ("Frey Decl."), Witham assisted the federal government in carrying out this federal directive by increasing web traffic to Witham's website, and, in turn to a secure

patient portal on Witham's website, which is accessible from the public website. Frey Decl. ¶¶ 2, 3.

Plaintiff Susan Whitaker-Pine alleges that Witham engaged in tortious conduct and invaded her privacy by installing third-party source code for the Meta Pixel on Witham's publicly available website. Specifically, Plaintiff alleges that the Meta Pixel caused the transmission of certain internet metadata from her internet web browser to third party internet web servers when she visited Witham's website. Plaintiff seeks to represent a class consisting of "[a]ll Indiana citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization." Complaint, ¶ 131.

Based on the allegations in Plaintiff's Complaint, this case belongs in federal court. One of the alleged web properties that forms the basis for the complaint is the Witham Patient Portal. *See id.* ¶¶ 6, 81; *see also* Motion to Remand, ECF No. 13 at p. 2 (asserting that Witham used the Meta Pixel on its digital health portal for marketing purposes). In like circumstances, at least two district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.,* No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). Because those cases are directly on point, well-reasoned, and consistent with longstanding Supreme Court and Seventh Circuit precedent, Witham respectfully urges the Court to follow these persuasive authorities and similarly deny Plaintiff's motion to remand.

## ARGUMENT

### A. Witham Properly Removed This Case Pursuant to 28 U.S.C. § 1442(a)(1).

Under the federal officer removal statute, a federal court has jurisdiction over a civil action that is directed at "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The statute was amended in 2011 to add the "or relating to" language and thus also broaden the scope of removable actions under the statute. As the Seventh Circuit has held: "Before 2011, removing defendants 'were required to demonstrate that the acts for which they were being sued occurred at least in part *because of* what they were asked to do by the government.'" *Baker v. Atlantic Richfield Co.*, 962 F.3d 937, 943 (7th Cir. 2020) (quoting *In re Commonwealth's Motion to Appoint Counsel*, 790 F.3d 457, 471 (3d Cir. 2015)). "In 2011, however, the statute was amended to encompass suits for *or relating to* any act under color of federal office." *Id.*; *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 295-96 (5th Cir. 2020) (en banc) (same).

Removal under 28 U.S.C. § 1442(a)(1) focuses on four basic elements: whether "'the defendant (1) is a person within the meaning of the statute, (2) is acting under the United States, its agencies, or its officers, (3) is acting under color of federal authority, and (4) has a colorable federal defense." *Id.* at 941 (quotation omitted). Plaintiff does not dispute that Witham is a "person" for purposes of the statute. Dkt. 1, ¶¶ 42-44; *see also* Dkt. 9, Memorandum of Law in Support of Plaintiff's Motion for Remand, p. 17. For reasons discussed below, driving website traffic to the patient portal assists the federal government in carrying out its federal mission to create a unified system for patient

electronic health records and optimizing patient access to their own health information. Thus, federal jurisdiction is proper.

**B. Witham Acted Under a Federal Officer, the National Coordinator, When Implementing the Meaningful Use Program.**

The heart of Plaintiff's Remand Motion focuses on whether Witham was in fact acting under color of federal law in relation to the allegations in Plaintiff's Complaint. *See* Dkt. 9, 7-12. The United States Supreme Court analyzed the relationship necessary to satisfy the "acting under" prong and determined those words must be "liberally construed." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). For a person to be "acting under" a federal officer, the person must be involved in "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152. While the "help or assistance" necessary to bring a private person within the scope of the statute does not include simply complying with the law, it is sufficient if the person or entity is subject to the "instruction, direction, or guidance" of a federal agency. *Id.* at 151-52.

In *Watson*, the plaintiffs alleged that Philip Morris Companies violated state law through, among other things, the design, performance, and testing of Philip Morris cigarettes. *Id.* at 146. Philip Morris removed the case to federal court, claiming that the FTC delegated testing authority of its cigarettes to an industry-financed laboratory and therefore Philip Morris was "'acting under' officers of the FTC when it conducts cigarette testing." *Id.* at 154. The Supreme Court disagreed and defined the scope of the term "acting under" using the following language:

> The relevant relationship is that of a private person "*acting under*" a federal "officer" or "agency." 28 U.S.C. § 1442(a)(1) (emphasis added). In this context, the word "under" must refer to what has been described as a relationship that involves "acting in a certain capacity, considered in relation to one holding a superior position or office." 18 Oxford English Dictionary 948 (2d ed. 1989). That relationship typically involves

> "subjection, guidance, or control." Webster's New International Dictionary 2765 (2d ed. 1953). *See also* Funk & Wagnalls New Standard Dictionary of the English Language 2604 (1942) (defining "under" as meaning "[s]ubordinate or subservient to," "[s]ubject to guidance, tutorship, or direction of"); 18 Oxford English Dictionary, supra, at 949 ("[s]ubject to the instruction, direction, or guidance of"). In addition, precedent and statutory purpose make clear that the private person's "acting under" must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior. *See, e.g., Davis v. South Carolina*, *supra*, at 600, 2 S. Ct. 636, 27 L. Ed. 574.

551 U.S. at 151-52.

*Watson* thus establishes a contextual analysis for the acting under requirement. Contrary to Plaintiff's assertion, the "requisite relationship" does not exist only where the defendant steps in to do a job the government would otherwise do itself. *See* Dkt. 9 at 7. *Watson* clarified that the relationships triggering the federal officer removal statute include, *but are not limited to*, those established by contract, *payment*, employer-employee relationships, and agent-principal arrangements. *Id.* at 151-52. *Watson* plainly recognizes that the words "acting under" mean "[s]ubject to the instruction, direction, or guidance of." The Supreme Court intended to leave open the prospect of affording federal removal jurisdiction to private persons in those circumstances where, as here, *there is something more* than compliance with the law.

In this case, Plaintiff's allegations relate to the Witham patient portal and the alleged disclosure of information when she clicks on the patient portal link. *See, e.g.*, Compl. ¶¶ 6, 81, 94, 147. A close examination of Witham's actions within the Meaningful Use Program demonstrates that Witham was *at minimum* assisting the federal government. The government paying providers like Witham for their compliance with the Meaningful Use Program (*see* Frey Decl.¶ 5) reflects the "payment" relationship *Watson* specifically identified as one that can satisfy the "acting under" requirement. 551 U.S. at

156. This payment relationship demonstrates how the federal government used private healthcare providers like Witham to fulfill a federal goal, not merely regulate healthcare providers. *See e.g., W. Virginia State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F. 4th 288, 301–02 (4th Cir. 2022).

*1.* *President Bush Establishes the Position of National Health Information Technology Coordinator*

In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("National Coordinator"). *See* Exec. Order 13,335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.* Through the Executive Order, President Bush further ordered that the National Coordinator "*shall* develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.* (emphasis added).

*2.* *The National Coordinator Makes Access to Online Health Care Records a National Priority*

From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD*, The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care, at pg. e (July 21, 2004).

But years later, when the percentage of Americans accessing their health information online remained low, the National Coordinator reported in 2015: "To truly

empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics*." *Id.* (emphasis added). *See also, e.g.*, Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center*, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("[O]nly 28% of physicians reported having EHRs that allowed patient access to records. Despite this, the architects of the MU rules have set the high bar for patient access and communication.").

3. *Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

In 2009, Congress codified the Office of the National Coordinator ("ONC") in the Health Information Technology for Economic and Clinical Health Act of 2009. American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 247 (2009).[1] At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [National Coordinator]." *Id.*

As with President Bush's Executive Order, Congress tasked the National Coordinator with a series of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such

[1] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A) (Strategic Plan).

Congress further codified a series of incentive payments for the Department of Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services, to make to health care providers for their adoption of health information technology, including through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES. SERV. Apr. 27, 2009) (discussing various financial incentives).

As the Congressional Research Service explained at the time: "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

### *4. The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations*

The following year, the Department of Health and Human Services adopted the Meaningful Use regulations. *See* Department of Health and Human Services, Centers for Medicare and Medicaid Services, *Medicare and Medicaid Programs*; *Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations, the agencies stated as follows: "Certified EHR technology used in a

meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44321.

One central component of the meaningful use regulations was the ability for patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients with the ability to *view online*, download, and transmit information about a hospital admission.") (emphasis added); *see id.* at (ii)(B) (same); Rebecca Mitchell Coelius, *Get the facts regarding view, download and transmit 2014 requirements,* HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

The regulations required health care providers to attest to the National Coordinator and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "[p]atient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

5. <u>*The National Coordinator Directs Healthcare Providers to Make Patient Portals Available to their Patients Online*</u>

To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." Nat'l Learning Consortium, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013). The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id.* Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3. Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use*." *Id.* (emphasis added).

6. <u>*Witham Acted Under a Federal Officer*</u>

In *UPMC*, as in this case, plaintiffs sought redress under state law for a hospital system's alleged unauthorized disclosure of their personally identifiable information to third parties (including Facebook) for marketing purposes. 2020 WL 4381675 at *1. The *UPMC* court explained:

> UPMC, as a participant in the Meaningful Use Program, *receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria*. (ECF No. 1, at ¶ 39). In particular, UPMC must, among other things, *raise awareness and increase usability of the UPMC website and the MyUPMC portal*. Id. at 1, ¶ 42. Plaintiffs' Complaint *addresses the design and functionality of UPMC's website and patient portal, implicating UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership. The fact that the government offers payment in exchange for UPMC's voluntary*

> *participation in implementing a nationwide EHR network* shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*. And, Plaintiffs' allegations are directed at this relationship. UPMC is therefore "acting under" a federal superior for purposes of the federal officer removal statute.

2020 WL 4381675 at *6 (emphasis added). But the federal government has done more than simply provide payment. The Meaningful Use Program prescribes a specific framework and guidelines for providers to follow, and the federal government monitored compliance with the program through Witham submitting detailed reports on patient portal activities. *See* Exhibit A, 2011-2015 Fed. Health Info. Strategic Plan. Through these reports, the federal government monitored Witham's activities in increasing the use of the patient portal. *See* Frey Decl. ¶ 4. The federal government also offered a model for providers to follow that uses third-party websites like Facebook, Google Plus, Twitter, and YouTube to increase engagements.[2]

Indeed, the federal government has repeatedly emphasized the collaborative nature of the Meaningful Use Program, further highlighting the close relationship between the government and Witham.[3] Plaintiff's argument that Witham was not "directed" by the federal government to make electronic health records accessible to patients ignores that it is the National Coordinator, a federal officer, who is responsible for leading this effort. *See* Exhibit B (Exec. Ord. 13,335). It also ignores the reality that in

---

[2] *See generally* https://www.medicare.gov/privacy-policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Google) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS) (last visited August 2, 2023).

[3] *See* Ex. C, ONC's updated 2015-2020 Federal Health IT Strategic Plan, at 8; *see also* Ex. D, ONC's updated 2020-2025 Federal Health IT Strategic Plan, at 2.

the absence of Witham's actions (and the work of comparable medical providers), the federal government would be left alone to complete its federal mission of digitizing health information and increasing engagement with Medicare beneficiaries. *See* Exhibit C, 2015-2020 Fed. Health IT Strategic Plan, at 4 ("participation of over thirty-five federal entities… demonstrate the extensive interest across the government to digitize the health experience for all individuals"). As the *UPMC* court recognized, the "federal government, as one of the largest purchasers of healthcare services, has emphasized the important role that health [information technology] plays in improving both the quality and efficiency of healthcare in the United States." 2020 WL 4381675 at *5.

Under nearly identical facts, the *UPMC* and *ProMedica* courts held that the healthcare providers acted like government contractors in implementing the Meaningful Use Program, thus qualifying for removal under Section 1442(a)(1). *UPMC*, 2020 WL 4381675 at *6; *ProMedica*, 2020 WL 7705627 at **2-3. As the *ProMedica* Court explained: "The aim of [the Meaningful Use Program] is to create a unified system of patient electronic health records. Because Defendant's participation assisted the federal government in achieving that goal, Defendant has satisfied the 'acting under' program." *Id.* (emphasis added).

Like UPMC and ProMedica, Witham gave its patients the opportunity to access information through a patient portal. *See* Frey Decl. ¶ 2. Every year since at least 2012, Witham has submitted reports on its involvement in the Meaningful Use Program[4] to the Centers for Medicare and Medicaid Services (CMS). *Id.* ¶ 4. These reports have been specifically prepared in order to meet federal Meaningful Use Program requirements and

---

[4] The Meaningful Use Program is now known as the Promoting Interoperability Program.

included submissions regarding Witham's linked patient portal and patients' use of that portal. *Id.* In the years that Witham satisfied the Meaningful Use Program criteria, Witham received incentive payments from the federal government for their implementation and use of Witham's linked patient portal and for providing access to patient health records online. *Id.* ¶ 5. Witham has been successful in meeting federal Meaningful Use Program criteria at least in part because of increased patient awareness and increased patient use of the patient portal. *Id.* ¶ 3. Plaintiff's complaint challenges Witham's website management practices designed to increase web traffic and increase engagement with Witham's website and patient portal in furtherance of the goals of the Meaningful Use Program.

Thus, when Plaintiff alleges that Witham violated Indiana law by transferring information to a third-party website server, she is attempting to hold Witham liable for an action taken under color of federal law: Witham's providing patients like Whitaker-Pine with the ability to access their health care records online. *See Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012) (holding "the protection which the law thus furnishes to the marshal and deputy, also shields all who lawfully assist him in the performance of his official duty"), *quoting Davis v. South Carolina*, 107 U.S. 597, 600 (1883)); *Baker*, 962 F.3d at 942 (allowing removal where "[w]ithout the aid of ISR, the government would have had to manufacture the relevant items on its own. For these reasons, this is not simply a case of compliance, but *assistance*.") (emphasis in original). That is precisely what Witham is doing—assisting the federal government with its initiative to provide patients like Plaintiff here with online access to their health care records. As the *UPMC* and *ProMedica* decisions illustrate, participation in the Meaningful Use Program is sufficient to satisfy the "acting under" requirement. The *UPMC* court also emphasized

that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior." 2020 WL 4381675 at *4. "The private entity need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id*. at *5.

Plaintiff also takes issue with Witham not citing a regulation or statute supporting its assertion that the Meaningful Use Program envisions cookies and website analytics to promote the patient portal and make it user friendly. *Id*. at 9. But the statute does not require that every causal act be "expressly authorized by a federal statute," and the statutory language "or relating to" in 28 U.S.C. § 1442(a)(1) was added specifically to "broaden the universe of acts that enable Federal officers to remove to Federal court." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia ("Defender Ass'n")*, 790 F.3d 457, 471-472 (3d Cir.2015) (discussing legislative history of federal officer removal statute). Moreover, 28 U.S.C. § 1446(a) requires only a "short and plain statement of the grounds for removal," which Witham provided in its Notice of Removal. *See* Dkt. 1, ¶ 3.

### C. Plaintiff's Claims Are for or Relate to Acts Under Color of the Federal Office.

Removal under § 1442(a)(1) also requires a finding that the claims against the defendant are "for, or relating to" an act under color of federal office. *Willingham v. Morgan*, 395 U.S. 402, 409 (1969). Plaintiff alleges that there is no nexus between her claims and Witham's participation in the Meaningful Use Program because "[t]here is no relationship between this conduct and anything the Centers for Medicare and Medicaid Services (or any other federal office) directed or incentivized Defendant to do." Dkt. 9 at 13. However, "[i]n order to meet the 'for or relating to' requirement, 'it is sufficient for

there to be a connection or association between the act in question and the federal office." *Willingham*, 395 U.S. at 471. Here, the allegations of Plaintiff's Complaint relate to ***how*** Witham fulfills the criteria set forth by the federal government in carrying out the Meaningful Use Program.

The relevant question is whether Witham's creation of a website and patient portal was "for, or relating to" the assistance Witham provided in implementing the Meaningful Use Program, not the micro-question surrounding the specific allegations regarding the Meta Pixel. And in framing her remand motion this way, Plaintiff does not acknowledge the fact that the Internet itself is based on third-party communications. *Reno v. Am. Civ. Liberties Union*, 929 F. Supp. 824, 830 (E.D. Pa. 1996), *aff'd* 521 U.S. 844, 849-50 (1997) ("The Internet is not a physical or tangible entity, but rather a giant network which interconnects innumerable smaller groups of linked computer networks. It is thus a network of networks."); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155 (9th Cir. 2007) ("a world-wide network of networks all sharing a common communications technology"). Thus, some communication is made to a third-party every time a visitor visits any website, merely for the Internet to function. *See, e.g.,* Fed. Trade Comm'n, *A Look at What ISPs Know About You: Examining the Privacy Practices of Six Major Internet Service Providers*, at pg. i (Oct. 21, 2021) (noting that "internet service providers ('ISPs') can monitor and record their customers' every online move, giving them the ability to surveil and amass large amounts of information on them as they go about their daily lives."); *see also* Douglas J. Lieth, *Web Browser Privacy: What Do Browsers Say When They Phone Home?*, at pg. 1 (IEEE*Access*, Mar. 10, 2021) ("Hence, while users are browsing the web Chrome shares data with Google services, Firefox with Mozilla servers etc. as part of a normal internal browser operation.").

Plaintiff's Complaint essentially asks the judiciary to pick and choose which of these third-party communications are appropriate. As the Supreme Court has made plain, however: "If the question raised is whether [the purported federal officer] w[as] engaged in some kind of 'frolic of their own' in relation to respondent, then they should have the opportunity to present their own version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish." *Willingham v. Morgan*, 395 U.S. 402, 409 (1969); *Baker*, 962 F.3d at 945 (likewise holding that "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal—not state—courts to answer") (quotation omitted).

Here, the Meaningful Use Program prescribes a specific framework and guidelines for providers to follow, and the federal government monitored compliance with the program through Witham submitting detailed reports on patient portal activities. *See* Frey Decl. ¶ 4. The federal government also offered a model for providers to follow that uses third-party marketers like Facebook to increase engagements.[5] Witham's actions go well beyond that of merely complying with federal laws and regulations and illustrate at least "detailed regulation" or "monitoring" by the federal government. *See* Ex. B at 7 ("monitor[] health IT successes"); *Goncalves*, 865 F.3d at 1245; *see also UPMC*, 2020 WL 4381675 at *6 (describing the criteria required for compliance with the Meaningful Use

[5] *See generally* https://www.medicare.gov/privacy-policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

Program). Thus, in implementing the Meaningful Use Program, Witham followed the close direction of the federal government.

Plaintiff notes that other courts have rejected *UPMC* and *ProMedica*, the first two courts to analyze the issue that allowed removal under the same basic theory. *Compare Doe v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), *interlocutory appeal denied*, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020); *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020), *interlocutory appeal denied*, 2020 WL 7705713 (N.D. Ohio Dec. 14, 2020), *with* Dkt. 9 at 11 (citing contrary cases). While Plaintiff illustrates the current split of authority among district courts, Plaintiff has not established that the grounds for removal in those cases are the same as in this one, none of those cases holds precedential weight in the Seventh Circuit, and they are distinguishable.

For example, *BJC Health Sys.*, which did reject the same basic grounds for removal, 2023 WL 369427, at *4-5, is now on appeal to the Eighth Circuit and awaiting oral argument. (8th Cir. Case No. 23-1107 (appeal filed Jan. 19, 2023)). The district court in that case incorrectly framed the statute codifying the Meaningful Use Program as "neither authoriz[ing] nor obligat[ing] the federal government to create the [electronic health records] *itself*." 2023 WL 369427 at *4 (emphasis added). But the operative issue is whether a federal officer was given a mandate to accomplish a federal goal, regardless of the means of implementing that goal. Executive Order 13335 imposed an obligation on a federal officer to carry out a federal goal by mandating that the National Coordinator "*shall*, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology." *See* Ex. A (emphasis added).

Similarly, in *Mohr* the district court improperly focused its decision on whether "there [wa]s 'evidence of any delegation of legal authority' from a federal agency to Defendant to undertake actions on the government's behalf." 2023 WL 3044594 *4 (citation omitted). But this is also the incorrect question. Instead, the proper question is whether the private entity's complained-of conduct "'involve[s] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Watson*, 551 U.S. at 152 (emphasis in original). As described above, Witham assisted the federal government in carrying out its federal directive through the Meaningful Use Program.

*Quinto* emphasized that "merely being subject to a regulatory scheme is not the same as acting under a federal agency's close direction." 2023 WL 1448050 at *3. *Heard* and *Browne* emphasized that the basis for removal were "general regulations and public directives regarding the development of health information technology and an electronic health records infrastructure." *Heard*, 2023 WL 2475544, at *3; *Browne*, 2023 WL 3095551, at *3. Again, Witham is not merely subject to a regulatory scheme, but rather has been paid incentive benefits by the federal government to fulfill the government's own mission of developing a nationwide electronic health records system. *See* Frey Decl. ¶ 5. For the reasons described above, Witham respectfully submits that *UPMC* and *ProMedica* have the better of the analysis in applying *Watson* to the facts at issue here.

As acknowledged by the *UPMC* court, Plaintiff's "allegations target mechanisms by which UPMC manages and markets its website and patient portal. *There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program*, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." 2020 WL 4381675 at *6 (emphasis added). Consistent

with the liberal construction of the "relating to" requirement, the plain language of Section 1442(a), and the guidance of the *UPMC* and *ProMedica* decisions, Witham satisfies the "relating to" requirement.

**D. Witham Raises Colorable Federal Defenses to Plaintiff's Claims.**

Witham asserts a colorable federal defense in this case, namely, that the information allegedly disclosed "is outside the purview of PHI protected by federal law." Dkt. 1, ¶ 64. Plaintiff responds by stating that "defenses related to Defendant's noncompliance with HIPAA are fact defenses relating to whether Defendant satisfied its standard of care." Dkt. 9 at 15. In doing so, Plaintiff concedes that Witham has a colorable defense subject to a federal court's interpretation.

As the Supreme Court has held, when an alleged, and disputed, federal statutory violation forms the basis for plaintiff's state law claims, removal under 28 U.S.C. 1442(a)(1) is appropriate. "To assert that a federal statute does *not* impose certain obligations whose alleged existence forms the basis of a civil suit is to rely on the statute in just the same way as asserting that the statute *does* impose other obligations that may shield the federal officer against civil suits." *Mesa v. California*, 489 U.S. 121 (1989): 489 U.S. at 130 (emphasis in original). "Both are equally defensive and equally based in federal law." *Id.*; *see also Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (holding that "[u]nder the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends upon federal law"). Further, a defendant need not show that it is entitled to prevail, only that it has a plausible federal defense. *See Ruppel v. CBS Corp.,* 701 F.3d 1176, 1182 (7th Cir. 2012).

Moreover, in similar cases challenging alleged website privacy violations, other federal courts have held the type of information at issue here is not protected under HIPAA. *See Smith v. Facebook*, 745 F. App'x 8, 9 (9th Cir. 2018) ("The district court also properly rejected Plaintiffs' claims that the collected data is subject to more stringent disclosure requirements under the Health Insurance Portability and Accountability Act of 1996 ('HIPAA')"); *see also Kurwowski v. Rush Sys. for Health,* No. 22 C 5380, 2023 WL 2349606, at *4-5, 7 (N.D. Ill. Mar. 3, 2023) (following *Smith*); *Cousin v. Sharp Healthcare*, No. 22-cv-2040-MMA (DDL), 2023 WL 4484441, at *3 (S.D. Cal. July 12, 2023) ("[T]his type of data collection is not considered "Protected Health Information" because nothing about [the] information relates specifically to Plaintiffs' health and the information is general health information that is accessible to the public at large.) (citations omitted.). Thus, Witham has a colorable federal defense.

Second, the "acting under" analysis set forth above also shows how preemption factors into Plaintiff's allegations regarding the patient portal, as both *UPMC* and *ProMedica held*. *UPMC*, 2020 WL 4381675, at *7; *ProMedica Health Sys., Inc.*, 2020 WL 7705627, at *3 (both finding federal preemption defenses colorable with respect to patient portal allegations). Federal jurisdiction under 28 U.S.C. § 1442(a)(1) rests on the basic "federal interest in the matter," the "very basic interest of the enforcement of federal law through federal officials." *Willingham*, 395 U.S. at 406; *Bor-Son Building Corp.*, 572 F.2d 174, 181 (8th Cir. 1978) (same). This federal interest exists here, and Witham has a plausible federal defense sustaining removal pursuant to the federal officer removal statute.

### E. Attorneys' Fees Are Not Appropriate.

Plaintiff requested that the court award attorneys' fees incurred as a result of the remand pursuant to 28 U.S.C. § 1447(c). The standard for awarding fees under § 1447(c) is whether the "removing party lacked an objectively reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141, 126 S. Ct. 704, 163 L. Ed. 2d 547 (2005). A defendant has an objectively reasonable basis for removal if "clearly established law" did not foreclose a defendant's basis for removal. *Wolf v. Kennelly*, 574 F.3d 406, 412 (7th Cir. 2009). As noted above, the Seventh Circuit has not addressed this issue and district courts have reached different conclusions regarding removal under the federal officer statute in similar cases. Thus, there is no clearly established law in this novel area, particularly where some district courts have sustained federal jurisdiction and others have not. Accordingly, Witham has a good faith basis to assert federal jurisdiction over this dispute and an award of attorneys' fees would be entirely inappropriate here.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Remand and retain jurisdiction of this case pursuant to the federal officer statute.

Dated: August 4, 2023

**BAKER & HOSTETLER LLP**

/s/ *Paul G. Karlsgodt*
Paul G. Karlsgodt
Michelle R. Gomez (*Pro Hac Vice* forthcoming)
BAKER & HOSTETLER LLP
1801 California Street, Ste. 4400
Denver, CO 80202
Tel: (303) 861-0600
Fax: (303) 861-7805
MGomez@bakerlaw.com
PKarlsgodt@bakerlaw.com

Tyler Moorhead (34705-73)
Philip R. Zimmerly (30217-06)
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000
(317) 684-5173 (Fax)
TMoorhead@boselaw.com
PZimmerly@boselaw.com

*Counsel for Defendant, Board of Trustees of the Flavius J. Witham Memorial Hospital*

## CERTIFICATE OF SERVICE

It is hereby certified that a true and accurate copy of the foregoing was this 4th day of August, 2023, filed using the CM/ECF system, which will electronically serve all counsel of record.

/s/ *Paul G. Karlsgodt*
Paul G. Karlsgodt